## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

LENESHA P. CLARK,

               Plaintiff,

v.

EQUIFAX INFORMATION
SERVICES, LLC,

               Defendant.

**Case No.:** 2:25-cv-12903

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

    1. **FCRA, 15 USC § 1681,** *et seq.*

Plaintiff Lenesha P. Clark ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant").

## I.    <u>INTRODUCTION</u>

    1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

all of society should ultimately benefit from the resulting convenience and efficiency.

2.     Unfortunately, however, this information has also become readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) [*quoting* 116 cong. Rec. 36570 (1970)] (*emphasis added*).

8.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with

fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. 1681(a)(4).

9.     Plaintiff's Complaint arises out of Defendant's blatantly inaccurate credit reporting, wherein Defendant failed to report Plaintiff's bankruptcy discharge in Plaintiff's report, resulting in additional inaccurate reporting by Defendant, who reported to Plaintiff's potential creditors that Plaintiff owed money on a tradeline that Plaintiff was no longer legally responsible for.

10.     Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of the FCRA, a federal law. *See* 15 U.S.C. § 1681p (FCRA) (permitting actions to enforce liability in an appropriate United States District Court).

13.     Venue in the Eastern District of Michigan is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### III.   PARTIES

14.     Plaintiff is a natural person who resides in Clinton Township, Michigan and is a "consumer" as defined by the FCRA, 15 U.S.C. § 1681a(c).

15.     Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers in the form of "consumer reports," as defined in 15 U.S.C. § 1681a(d)), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, GA 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

16.     During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

17.     Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing

"consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and is therefore a "consumer reporting agency" ("CRA") as defined by 15 U.S.C. § 1681a(f) of the FCRA.

18.     During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

19.     Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violation.

## IV.     FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

20.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit

reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

### Factual Background

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day and also sells credit scores.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Defendant regularly purchases and obtains consumer bankruptcy information to include the consumer reports it sells to third parties for profit.

28.     Defendant's consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

29.     Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant by furnishers, and other information is independently gathered by Defendant from third party

providers/vendors or repositories, like computerized reporting services like PACER and Lexis-Nexis.

30.     Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information, with the intention of including such information in the consumer reports Defendant sells.

31.     Defendant's unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

32.     Defendant's unreasonable policies, procedures, and/or algorithms additionally consistently fail to identify and update bankruptcy cases/filings entirely as required by § 1681e(b).

33.     Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its own files.

34.     The vast majority of institutions that offer financial services, e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions.

35.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of

reported debt, payment history, date of delinquencies contained in Defendant's reports.

36.    The information Defendant includes in consumer reports contributes to a consumer's overall creditworthiness and determines their FICO Score(s).

37.    FICO Scores are calculated using information contained in Defendant's consumer reports.

38.    Defendant knows that FICO and other third-party algorithms (including the algorithms owned by the CRAs, including Defendant) use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their creditworthiness.

39.    Defendant knows that FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a.    "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on their credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

40. Defendant knows that lenders also consider a consumer's debt-to-income ratio ("DTI") before deciding to extend credit or approve financing terms.

41. DTI compares the total amount a consumer owes (based on the total amount of debt reported by Defendant in its consumer reports) to the total amount a consumer earns.

42. A consumer's income, however, is not included in their consumer report; only their amount of debt is. Consumers enter their income into credit applications. Therefore, DTI is not calculated in a consumer's credit score, but is a factor in credit decisions.

43. The higher the amount of reported debt that a consumer has, or is *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit. Moreover, if credit is extended at all, consumers may be offered terms for lower credit limits and higher interest rates.

44. Equifax is aware that DTI plays an impactful role in the evaluation of consumer credit applications, stating on its own website: "Lenders may consider

11

your DTI ratio as one factor when determining whether to lend you additional money and at what interest rate. Generally speaking, the lower a DTI ratio you have, the less risky you appear to lenders."[1]

45.     A consumer who has obtained a bankruptcy discharge and has a discharged account inaccurately reporting with an outstanding or past due balance after the bankruptcy discharge therefore suffers greater harm than if that account was accurately reporting with a zero-dollar balance, especially if that account is an collections/charged off account with a balance asserted to be owed, as is the case here.

46.     Despite the availability of accurate consumer information, Defendant regularly reports inaccurate information about accounts after consumers receive a Discharge Order.

47.     Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

48.     Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendant frequently reports information

---

[1] *Debt-to-Income Ratio vs. Debt-to-Credit Ratio*,
https://www.equifax.com/personal/education/credit/score/articles/-/learn/debt-to-income-ratio-vs-debt-to-credit-ratio/

concerning pre-bankruptcy debts based on information it knows is incomplete or inaccurate.

49.     Consequently, Defendant regularly publishes consumer information that conflicts with information: provided by data furnishers to Defendant, already included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

50.     Defendant routinely reports inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by § 1681e(b).

51.     Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendant's own files.

52.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

53.     Defendant fails to employ reasonable procedures to assure the maximum possible accuracy of the information that it reports about consumers, including, but not limited to, account balances, account statuses, payment histories, and payment statuses.

54.     Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau (CFPB) complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

55.     Thus, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures. More specifically, Defendant is on continued notice that its inadequate procedures regularly result in the reporting of inaccurate public records, balances, account statuses, payment histories, and/or payment statuses.

56.     Defendant has received and documented many disputes from consumers complaining that Defendant reported inaccurate information about them.

<u>*Allegations Specific to the Credit Reporting of Plaintiff*</u>

57.     Plaintiff filed for a "no asset" Chapter 7 Bankruptcy on or about February 25, 2025 in the United States Bankruptcy Court for the Eastern District of Michigan, petition no. 25-41154-tjt (the "2025 Bankruptcy").

58.      Plaintiff received an Order of Discharge on or about May 29, 2025.

59.     Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

60.     Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

61.     The allegations in this complaint against Defendant are based on the reporting by Defendant in Plaintiff's July 14, 2025 consumer disclosure.

62.     Defendant reported Plaintiff's credit history, including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the date of the last status update.

63.     Defendant failed to report Plaintiff's 2025 Bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

64.     Notably, the other CRAs, Experian and Trans Union, accurately reported Plaintiff's 2025 Bankruptcy information in the Public Records sections of their respective reports, and in the individual tradelines of their respective reports.

65.     Upon information and belief, Defendant received notice of Plaintiff's bankruptcy discharge through its independent collection of Plaintiff's consumer information through vendors such as Lexis-Nexis, as well as from furnishers that provided data regarding the individual tradelines featured on Plaintiff's consumer reports.

66.     Defendant also obtains information from other CRAs (who commonly share information).

67.     Defendant is aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

68.     Defendant should have reported Plaintiff's 2025 Bankruptcy filing and discharge information in the public records section of Plaintiff's consumer reports.

69.     Defendant should have reported all of Plaintiff's dischargeable, pre-petition debts as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero balance but did not.

70.     Defendant should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and with a zero-dollar balance.

71.     Rather than accurately report the discharged debts, Defendant reported Plaintiff's accounts with inaccuracies.

### *Inaccuracies on Plaintiff's Consumer Report*

72.     On or about July 14, 2025, Plaintiff obtained a copy of her Equifax credit report.

73.     Upon review of her Equifax credit report dated July 14, 2025, Plaintiff observed several inaccuracies.

74.     As a preliminary matter, Equifax did not report Plaintiff's 2025 Bankruptcy filing or discharge.

75.     The name, social security number, and address in Plaintiff's 2025 Bankruptcy Chapter 7 petition match the information listed on her Equifax consumer report.

76.     Defendant failed to report Plaintiff's 2025 Bankruptcy discharge even though Defendant had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

77.     Notably, non-parties Experian and Trans Union accurately reported Plaintiff's public record 2025 Bankruptcy filing and discharge based on the same information.

78.     Additionally, furnishers reported the Plaintiff's discharged/zero account balances, bankruptcy and discharge information to Equifax.

79.     Defendant knew or should have known that Plaintiff's 2025 Bankruptcy was discharged.

80.     Defendant reported debts that were in fact discharged in bankruptcy and was therefore required to report these as discharged and with a zero-dollar balance. However, Defendant's failure to report Plaintiff's bankruptcy – filed in February

2025 and discharged in May 2025 – in Plaintiff's consumer report contributed to the numerous inaccuracies listed in Plaintiff's consumer report.

81.     Upon information and belief, the following furnishers of information accurately reported to Equifax that Plaintiff's accounts were included in Plaintiff's 2025 Bankruptcy discharge and had a zero-dollar balance after the bankruptcy filing/discharge, but Defendant rejected or revoked the data furnished to it and inaccurately overrode the reporting of the accounts.

82.     On Plaintiff's consumer disclosure, Defendant inaccurately reported Plaintiff's Public Service Credit Union account, ending with ****9002 and opened in November 2022 (the "Account"), which pre-dated Plaintiff's bankruptcy filing.

83.     The Account was discharged on or about May 29, 2025. Therefore, the Account should have been reported as discharged in bankruptcy.

84.     However, Defendant inaccurately reported the Account with a status of "Collection/Charge-Off" and with a balance of $647.00.

85.     The status of "Charge Off" in the consumer credit industry means that a debt may still be owed, especially where, as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "charge-off."

86.     The national consumer reporting agencies specifically acknowledge that a "charge-off" generally means consumers are still legally responsible for paying the debt.

87.     According to Equifax, a charge-off means the lender has written the account off as a loss and the account is closed to future charges. The timeframe is generally between 120 and 180 days after a consumer becomes delinquent, and a charge-off does not mean that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

88.     Upon information and belief, Lexis-Nexis furnished information to all three CRAs, including Defendant, that indicated Plaintiff had filed for bankruptcy and received a discharge, but Defendant rejected or otherwise failed to report the data it received.

89.     Upon information and belief, some or all of the data furnishers of the foregoing tradeline provided information to all three CRAs, including Defendant, that indicated their corresponding accounts had been discharged in bankruptcy, but Defendant rejected or otherwise overrode the data it received.

90.     In addition, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Defendant through multiple sources such as PACER, but, Defendant failed to review those sources or knowingly rejected them.

91.     In any event, Defendant knew or had reason to know that it reported information contradicted by notices received from third parties.

92.     Defendant inaccurately reported that Plaintiff owed money that she did not actually owe, and also reported an inaccurate account status and payment history.

93.     Defendant inaccurately reported an account with a balance owed after it was discharged in Chapter 7 Bankruptcy.

94.     Defendant failed to indicate that the foregoing Account had a zero-dollar balance and was discharged in Chapter 7 Bankruptcy.

95.     Defendant also erroneously reported that the discharged Account was a charged off account after the discharge.

96.     Notably, Experian and Trans Union, the two other national CRAs, reported Plaintiff's Account accurately on consumer reports produced after Plaintiff's discharge.

97.     Defendant's reporting of the Account is patently inaccurate.

98.     If not patently inaccurate, Defendant's reporting of the Account is materially misleading.

### *Plaintiff's Damages*

99.     Plaintiff's DTI was negatively affected by Defendant's reporting of $647.00 of debt which Plaintiff does not owe, in turn negatively impacting Plaintiff's credit worthiness.

100.    After her bankruptcy discharge, on July 10, 2025, Plaintiff applied for a Capital One credit card and was approved for a $200 secured credit card at higher rates, and lower credit limit and/or worse overall terms due to the inaccurate reporting of the Account by Defendant.

101.    Additionally, on or about August 28, 2025, Plaintiff applied for Citibank credit card and was denied due to the inaccurate reporting of the Account by Defendant.

102.    Defendant's inaccurate reporting of the Account, along with additional information belonging to Plaintiff, was published to potential creditors by Defendant during the process of Plaintiff's credit applications.

103.    Plaintiff's consumer credit file and consumer reports were also reviewed by numerous other entities after the discharge of her bankruptcy; those entities viewed the erroneous information published by Equifax.

104.    As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

105.    As a result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

106.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, disturbance of sleep, reputational damage, humiliation, stress, anger, frustration, shock, invasion of Plaintiff's privacy, embarrassment, and anxiety.

107.    Defendant's conduct exacerbated Plaintiff's frustration during the already stressful post-bankruptcy period by hindering Plaintiff's ability to rebuild her credit.

## V.    COUNT I
## Violations of the FCRA, 15 U.S.C. § 1681e(b)

108.    Plaintiff incorporates herein by reference all the above paragraphs of this Complaint as though fully set forth herein at length.

109.    The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

110.    In this case, Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of credit information pertaining to pre-bankruptcy debts after a consumer receives a Discharge Order.

111.    Defendant received notice of Plaintiff's 2025 Bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendant through sources of consumer information such as Lexis

Nexis, Defendant's own files, and information provided by data furnishers, yet Defendant rejected that information.

112.    Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

113.    Defendant's unreasonable policies and procedures cause it to regularly report consumer information without verifying its accuracy.

114.    Defendant's unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681(e)(b).

115.    Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records and its own files, including other furnishers that report to Defendant that the consumer's bankruptcy has been discharged.

116.    In this case, the inaccurately reported a debt pertaining to an account Defendant knows pre-dated Plaintiff's Chapter 7 2025 Bankruptcy, was included and discharged by Plaintiff's 2025 Bankruptcy discharge, and should therefore have reported with a zero-dollar balance.

117.    Defendant's failure to maintain and employ reasonable procedures to assure the maximum accuracy of consumers' post-bankruptcy accounts is

particularly egregious because Defendant regularly and voluntarily searches for consumer bankruptcy information to include in credit files.

118.   Defendant knew or should have known it is obligated, by the FCRA, to maintain and employ reasonable procedures to assure it reports maximally accurate consumer credit information.

119.   Defendant knew or should have known it is obligated, by the FCRA, to update consumer reports and individual tradelines after receiving notice of a Chapter 7 Bankruptcy Discharge.

120.   Defendant knew or should have known that the effect of a Discharge Order in a no-asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

121.   CRAs' obligations are established by the plain language of the FCRA, promulgated by the Federal Trade Commission, supported by well-established case law, and demonstrated in prior cases involving the Defendant.

122.   Therefore, Defendant had ample notice of its obligations under the FCRA and its continued use of unreasonable procedures.

123.   If Defendant contends it did not have sufficient notice, Defendant must justify its own failure to review and/or locate the substantial written materials that

detail CRAs' duties and obligations under the FCRA, including where consumers file for Chapter 7 Bankruptcy.

124. Defendant regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer reports it sells to other parties for a profit.

125. In this case, Defendant knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

126. When Defendant received notice of Plaintiff's bankruptcy information, it had an obligation to ensure it reported Plaintiff's discharge and its effects with maximal accuracy.

127. Unfortunately, Defendant willfully and consciously breached its duties as a CRA and deprived Plaintiff of her right to a fair and accurate consumer report.

128. Despite knowledge of its legal obligations, Defendant violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to ensure maximum possible accuracy of Plaintiff's consumer disclosure consumer report.

129. In this case, Defendant failed to report Plaintiff's bankruptcy information and reported the Account with a status other than "discharged in bankruptcy," and with a balance, instead of a zero-dollar balance.

130.   Defendant knew or should have known the information it reported about the Account was inaccurate.

131.   Defendant violated 15 U.S.C. § 1681e(b) by failing to report accurate information when Defendant knew or should have known the information Defendant is reporting is inaccurate, and/or otherwise contradicted by information known by Defendant, reported to Defendant, and/or reasonably available to Defendant.

132.   Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

133.   Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

134.   Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

135.   Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

136.   Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, loss of sleep, stress, anger, frustration, shock, embarrassment, and anxiety.

137.   Defendant is a direct and proximate cause of Plaintiff's damages.

138.   Defendant is a substantial factor in Plaintiff's damages.

26

139.    Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgments against Defendant for the following:

(a)    Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

(b)    An award of actual damages pursuant to 15 U.S.C. §§ 1681n(a)(1) or 1681o(a)(1);

(c)    An award of statutory damages pursuant to 15 U.S.C. §§ 1681n(a)(1) and 1681o(a)(1);

(d)    An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1681n(a)(2),

(e)    Costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

(f)    Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

//

**JURY DEMAND**

Plaintiff hereby demands jury trial on all issues so triable.

RESPECTFULLY SUBMITTED this 12th day of September

By: /s/ Landon T. Maxwell
Landon T. Maxwell, AZ #038439
CONSUMER JUSTICE LAW FIRM
8095 N 85th Way
Scottsdale, AZ 85258
T: (480) 626-1975
F: (480) 613-7733
E: lmaxwell@consumerjustice.com

*Attorneys for Plaintiff*
*Lenesha P. Clark*